JODI LINKER
Federal Public Defender
Northern District of California
ANA BOTELLO
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Ana_Botello@fd.org

Counsel for Defendant AGUILAR

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANGEL AGUILAR,<br><br>Defendant. | **Case No.:** CR 26–00232 CRB<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Court:** Courtroom 6, 17th Floor<br>**Hearing Date:** Nov. 4, 2026<br>**Hearing Time:** 10:00 a.m. |

## INTRODUCTION

As a young boy, Angel Aguilar was groomed and sexually abused by an older, trusted relative for over two years. Mr. Aguilar, already a quiet, awkward child, who was born with a congenital kidney condition and suffered from epilepsy, did not want to cause his family any more problems than they already had. His parents struggled financially and were often in conflict. On many occasions, Mr. Aguilar witnessed his father repeatedly hit his mother and older brothers. Following his abuse, Mr. Aguilar began suffering from seizures where he would experience a temporary loss of consciousness, convulsions, muscle stiffness, altered breathing and heart rate. Mr. Aguilar remembers screaming and vomiting after these episodes. As the years passed, Mr. Aguilar never told anyone about the grooming, humiliation and sodomization he had experienced. He wanted to protect his parents, siblings and extended family from the emotional upheaval a disclosure of his abuse would cause. He told no one and pushed the experiences to the back of his mind and tried to survive.

In the years following his abuse, Mr. Aguilar began to have both behavioral and learning problems at school such that he was placed in special education classes for the first time. He also commenced seeing neurologists and mental health providers that prescribed him a variety of drugs to address his seizures, and also antidepressants to address his moods. At no point, did Mr. Aguilar share with his providers or family that he had been sexually abused.

Around the age of fifteen, Mr. Aguilar injured his meniscus and began having pain in his knee. In 2009, Mr. Aguilar graduated high school, continuing a special education curriculum. He and his family continued to attempt to address his neurological, emotional and physical health concerns. After graduation, Mr. Aguilar enrolled at Napa Valley Community College as he sought to establish himself as an adult while continuing to live at home. In the years 2013-2016, Mr. Aguilar had surgery on his knee to attempt to repair the damage to his meniscus, and also had surgery to mitigate his congenital kidney condition. Around this time, Mr. Aguilar also attempted to end his own life as his dreams of a career in law enforcement closed in front of him due to his physical limitations.

With the support of his family, with whom he continued to live, Mr. Aguilar eventually obtained lasting employment as a clerk at a wine distributor, and later a new career working as a security guard for many years. As his sustained employment and earning ability grew, Mr. Aguilar always kept the

dark secret of his abuse hidden and commenced going to the internet, instead of treatment, to cope with the trauma he had experienced as a child, and that he had still never shared with anyone.

In 2025, law enforcement executed a search warrant on Mr. Aguilar's room and found large amounts of child sexual abuse material (CSAM) on his devices. After an initial denial, Mr. Aguilar went on to make a full confession to the arresting agents and expressed deep disgust with himself stating, "I don't know what's wrong with me." Initially arrested and released by local law enforcement, federal authorities commenced prosecution of this case in November 2025. On December 3, 2025, Mr. Aguilar was arrested on the instant charges and later released with pretrial supervision by Magistrate Judge Thomas S. Hixson. Since his release, Mr. Aguilar has complied with his conditions of supervision and has never had a sustained violation. Until recently, Mr. Aguilar was able to continue working, however, he was terminated when his employer found out about the instant charges.

Importantly, Mr. Aguilar has also been attending treatment for the first time—both individual counseling and the sex offender treatment he receives through Pretrial Services. It was finally during this past year that Mr. Aguilar disclosed the abuse to his family and was also diagnosed with Post Traumatic Stress Disorder (PTSD). Through weekly meetings with his provider, Mr. Aguilar was finally able to commence addressing the pain and hurt he had carried with him, which contributed to the instant offense. Unfortunately, if he is sentenced to incarceration in the Bureau of Prisons (BOP) the therapy and treatment that has been so effective for him will likely cease.

This is a serious case, and Mr. Aguilar has acknowledged from his first contact with police the deep shame he correctly feels for having committed the offense. Through therapy and reflection, he now fully understands the impact viewing child pornography has on the victims. But mitigating factors are present here to an unusual degree: the dysfunctional childhood home, the sexual abuse he suffered and repressed, the significant collateral consequences such as the loss of his career, his successful treatment that he will not be able to continue in prison, and finally, his role as a support system to his family. Accordingly, Mr. Aguilar respectfully requests that the Court sentence him to no more than 36 months of incarceration to be followed by a five-year term of supervised release.

## SENTENCING RECOMMENDATION

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*,

337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996) (quotations omitted)). Ultimately, the "overarching statutory charge for a district court is to 'impose a sentence sufficient but not greater than necessary'" to reflect the factors detailed in 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quoting 18 U.S.C. § 3553(a)). The § 3553(a) factors assist the Court in fulfilling its mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985).

In short, this Court has the authority and responsibility in this case to impose a sentence, without undue regard for the advisory Guideline range, that serves the purposes of retribution, deterrence and rehabilitation, and is no greater than necessary in light of all the facts before it. Mr. Aguilar submits that the factors addressed below weigh in favor of a significantly below-Guidelines sentence.

## I. The Advisory Sentencing Guidelines Range.

The parties agree that the applicable guidelines are:

| | |
|---|---|
| Base Offense Level, U.S.S.G. §2G2.2(a)(1 ): | 18 |
| Specific offense characteristics under U.S.S.G. Ch. 2 | |
| - Pre-pubescent minor - U.S.S.G. §2G2.2(b)(2) | +2 |
| - Sadistic/Masochistic images - U.S.S.G. §2G2.2 (b)(4)(A) | +4 |
| - Use of a computer - U.S.S.G. § 2G2.2(b)(6) | +2 |
| - 600+ images – U.S.S.G § 2G2.2(b)(7)(D) | +5 |
| Acceptance of Responsibility: | - 3 |
| Adjusted Offense Level: | 28 |

Combined with Mr. Aguilar's Criminal History Category of I, the Total Offense Level of 28 produces a guideline range of 78 to 97 months. The government has agreed to recommend a sentence no higher than that associated with a total offense level of 24 (four levels below the guidelines, for a range of 51-63 months at CHC I) followed by five years of supervised release. In turn, United States Probation recommends a downward variance resulting in a sentence of 48 months with 10 years of supervised release to follow. Mr. Aguilar respectfully requests a further downward variance to

achieve a sentence of no more than 36 months of prison with five years of supervised release.

**II. Section 2G2.2 is not based on empirical evidence and JSIN numbers reflect broad judicial disagreement with the guideline.**

The four specific offense characteristics present in Mr. Aguilar's case are typical in internet-based child pornography cases because large quantities of graphic images involving very young victims are, sadly, widely circulated online. *United States v. R.V.*, 157 F. Supp. 3d 207, 232 (E.D.N.Y. 2016)( (imposing a <u>non-custodial</u> sentence for a defendant with a Guidelines range of 78 to 97 months). Indeed, according to the Sentencing Commission's fiscal-year 2025 figures,[1] the percentage of child pornography defendants who received the same four enhancements identified above are:

§ 2G2.2 (b)(6) Use of a computer: 97.5% of defendants

§ 2G2.2 (b)(7) Number of images: 95.7% of defendants[2]

§ 2G2.2(b)(2) Victim under the age of 12 years: 93.2 % of defendants

§ 2G2.2 (b)(4) Sadistic/masochistic or infant/toddler abuse: 81.6% of defendants

*Use of Guidelines and Specific Offense Characteristics,* U.S. SENTENCING COMMISSION, at 98-99 (Fiscal Year 2025).

In the modern world, all child pornography offenses involve use of a computer, and the nature of that computer use regularly involves the mass download and easy storage of CSAM images, often in such large numbers that it is unlikely they have all been viewed by a particular defendant. *United States v. Burns*, 2009 WL 3617448, at *7 (N.D. Ill. Oct. 27, 2009) (unpublished); *see also United States v. Diaz*, 720 F. Supp. 2d 1039, 1042 (E.D. Wis. 2010) (explaining that enhancement for number of images is a questionable measure of culpability because, due to the nature of downloading, "offenders readily obtain the necessary number of images with minimal effort.").

Because these four specific offender characteristics, adding a combined total of 13 levels, apply to most child pornography cases, they fail to appropriately measure a defendant's culpability. In a

---

[1] USSC 2025 Use of Guidelines and Specific Offense Characteristics Guideline Calculation Based for Fiscal Year 2025, available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2025/Ch2_Guideline_FY25.pdf

[2] As many as 77.5% of defendants receive the same five-level enhancement as Mr. Aguilar under subsection (b)(7)(D) for having more than 600 images. Id. at 99.

thorough report published in 2021, the Sentencing Commission itself explained that §2G2.2's enhancements "have not kept pace with technological advancements." *Federal Sentencing of Child Pornography: Non-Production Offenses*, U.S. SENTENCING COMMISSION at 68 (Jun. 2021) ("Facilitated by technology, child pornography offenses increasingly involve images in great quantities and of a graphic nature, often depicting the youngest of victims.").[3] Guideline § 2G2.2 "no longer effectively differentiates among offenders in terms of either the seriousness of the offense or culpability of the offender." *Id.* at 69. Although these enhancements presumably are designed to distinguish among offenses and offenders, in practice they apply in virtually every case, leaving little room for a sentencing court to distinguish which defendants are the most or the least culpable. Ordinarily, the Guidelines are entitled to deference because they are the product of years of data-driven and considered analysis. When, as here, a particular Guideline is not the result of careful study or empirical analysis, by contrast, such deference is unfounded. *See Kimbrough*, 552 U.S. 85 at 108–09. Accordingly, the Court should not rely on § 2G2.2 as it would other guidelines.

The sentences imposed by federal judges reflect the Commission's concerns with § 2G2.2. As this Court is aware, countless non-production child pornography defendants over the years have been sentenced to terms of imprisonment significantly lower than those suggested by the advisory Guidelines. In 2025, for example, over half (57.1%) of all sentences imposed under §2G2.2 resulted in a variance.[4] During the last five fiscal years (FY2021-2025), 73% of defendants with Mr. Aguilar's guidelines nationwide received a downward variance from the 78 to 97 month range, and even accounting for the 25% of defendants who were sentenced within the guideline range, the average length of imprisonment was 56 months, with a median sentence of 60 months.[5] Mr. Aguilar's individual

---

[3] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf.

[4] *2025 Sourcebook of Federal Sentencing Statistics*, UNITED STATES SENTENCING COMMISSION, Table 32 ("Sentence Imposed Relative to the Guideline Range by Primary Sentencing Guideline") available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2025/Table32.pdf.

[5] The Judiciary Sentencing Information (JSIN) platform is an online sentencing data resource that provides sentencing data for similarly situated defendants, available at: https://jsin.ussc.gov/analytics/saw.dll?Dashboard

characteristics are not average, as both the government and probation agree. Because Mr. Aguilar's exposure to domestic violence, sexual abuse, physical and mental health limitations, along with his rehabilitation record on pretrial supervision, at minimum, he should receive a lower sentence than the average defendant.

## III. If Mr. Aguilar had been charged in state court, 60 months would be the maximum sentence he could receive.

Admittedly, when evaluating the need to avoid unwarranted sentencing disparities under § 3553(a)(6), courts do not often consider both state and federal defendants, even those accused of the same crimes, to be similarly situated. However, in this case, Mr. Aguilar was charged by the state before the federal government brought charges on the same grounds (the state case was dismissed). If he had been charged only in state court, a much lower sentence would be deemed to satisfy the purposes of retribution, deterrence and rehabilitation. In California, first-time child pornography possession is charged under California Penal Code section 311.11. It can be charged as a misdemeanor or a felony, and the possible sentences for felony cases involving 600 or more images or that portrays sadism or masochism with a minor are probation with possible county jail time, or 16 months, 2, or 5 years in state prison. Cal. Pen. C. § 311.11(c). That means that if Mr. Aguilar were charged in state court, the absolute maximum, reserved for those with overwhelming aggravating factors. In practice, sentences for first-time offenders are much lower. A 10-attorney Bay Area criminal defense firm even publicizes on their website that "a felony [child pornography] plea usually leads to a probation sentence with a local jail sentence. Generally speaking, cases in Santa Clara (San Jose, Palo Alto, etc) will be offered a 6 months county jail sentence. In Alameda County, the initial offer is usually felony probation and no jail sentence."[6] Here, Mr. Aguilar's prosecution was commenced by Napa County, but was later brought federally where he is facing what would have been an aggravated sentence in the state, when, in fact, Mr. Aguilar's case has significant mitigation.

## IV. The collateral consequences in this case are a significant punishment already.

The collateral consequences of this conviction will meaningfully reflect the seriousness of the

---

[6] Summit Defense Criminal Lawyers, *Bay Area Child Pornography Laws & Defense*, available at: https://summitdefense.com/sex-crimes/child-pornography/# (last accessed May 13, 2026).

offense and contribute to a just punishment. § 3553(a)(2). Even before sentencing, this case has already disrupted the working life Mr. Aguilar built with considerable effort. See Exhibit B: Letter from Chad Kotta. In the month preceding sentencing, Mr. Aguilar's employer ran background checks on all employees and found out about this case. Immediately, he was placed on administrative leave and was later terminated from a job he had held for nearly four years (first as a contractor and later a full-time employee). The Court may take judicial notice that individuals who are registered sex offenders have great difficulty finding both housing and employment after such convictions. While these consequences may not be as retributive as pure incarceration, they are nevertheless meaningful punishments which will last a lifetime. The record therefore establishes a concrete employment consequence, not merely speculation.

## V. The history and characteristics of Mr. Aguilar further support a downward variance.

Since the date of his arrest, Mr. Aguilar has been unambiguous about his guilt and profound remorse. He made a full confession, stated he felt disgusted with himself, and showed the investigating agents the websites he accessed. The following history is not an attempt to excuse his conduct, but to provide essential context to understand how an otherwise hardworking, law-abiding citizen committed acts that culminated in this offense—and why a mitigated sentence best serves both justice and the needs of his family, the community, and the victims he will be repaying for the rest of his life.

### 1. Mr. Aguilar's early childhood was marred by violence, humiliation and unmet developmental needs

Mr. Aguilar's first memories include witnessing his father assault his mother. See Exhibit A: Mitigation Report, hereafter "MR." Before Mr. Aguilar was born, his mother lost a twins pregnancy following domestic violence; his oldest brother Jaime was also physically abused. Although Mr. Aguilar was not himself physically abused by his father, he grew up knowing that violence could occur within the home. PSR ¶¶ 44–45; MR at 2–3. His self-reported adverse-childhood-experiences score was six out of ten. PSR ¶ 56.

Mr. Aguilar's difficulties followed him into the classroom. His brother Rafael recalls a second-grade teacher humiliating Angel for unusual speech and inappropriate laughter, even dumping his belongings on the floor for him to retrieve. See Exhibit C: Letter from Rafael Aguilar. His father

independently describes the same classroom humiliation and recalls that school noise overwhelmed Angel. See Exhibit D: Carlos Aguilar Letter. By middle school, Mr. Aguilar was taking antidepressants and receiving special-education services that continued through high school. PSR ¶¶ 50, 58.

Family members describe Mr. Aguilar's lifelong problems reading social cues, regulating emotions, and exercising judgment. His brother Jaime explains that, although Mr. Aguilar taught himself to build and repair computers, he struggles with basic financial decisions. See Exhibit E: Letter from Jaime Arroyo. Technical ability and adaptive limitations can coexist; the former does not erase the latter. His exploitation in a romantic relationship and resulting debt provide concrete examples of those vulnerabilities. PSR ¶ 47; MR at 6–7.

Several relatives describe Autism, his brother Rafael recalls a school counselor identifying Angel as on the spectrum. PSR ¶ 50; MR at 8–9, Exhibit F: Letter of Eloy Aguilar; Exhibit G: Letter from Angelica Aguilar Letter. *United States v. Floyd*, 945 F.2d 1096, 1099 (9th Cir. 1991), historically recognized "youthful lack of guidance" as a departure consideration. The present request rests on § 3553(a)(1). Mr. Aguilar reached adulthood with significant vulnerabilities and without having disclosed the trauma underlying many of his struggles. The same vulnerabilities that have made Mr. Aguilar's childhood, and adult life difficult, will be exacerbated in a prison environment. Because of his shy and odd demeanor, Mr. Aguilar is very likely to be targeted and exploited by other inmates. For this reason alone, the Court should downward vary.

**2. Serious medical problems and mental health concerns will be exacerbated in prison**

Mr. Aguilar was born with a congenital horseshoe kidney. Separately, he also developed seizures as a child, reportedly occurring once or twice a week and sometimes involving screaming and vomiting. His mother sought neurological and psychological care. MR at 3–4; PSR ¶ 53.

A torn meniscus in adolescence led to knee surgery in 2013, but continuing pain affected his ambitions and daily life. Mr. Aguilar also underwent surgery in 2016 for an obstruction associated with a congenital horseshoe kidney, followed by two additional procedures. His kidney now functions normally, but he requires periodic CT scans. PSR ¶¶ 51–52. These conditions form part of a lifelong pattern of medical vulnerability and physical limitations endured by Mr. Aguilar.

In 2014, depressed by the belief that his physical limitations foreclosed law enforcement, Mr. Aguilar attempted suicide by overdosing on pills before family intervened. After his arrest in this case, he again considered suicide and disclosed a plan to jump from the Golden Gate Bridge. His brother Jaime helped him through that crisis. PSR ¶ 54.

A prison environment, especially a lengthy one, is likely to exacerbate Mr. Aguilar's conditions, or put him in unnecessary risks. Due to his physical and emotional problems, this Court should downward vary.

**3. Mr. Aguilar's rehabilitation is best achieved in a non-prison setting.**

From ages eight to ten, Mr. Aguilar was groomed by an adult relative who exposed him to pornography, invoked a "princess" identity, and sexually assaulted him, including sodomization. PSR ¶ 46; MR at 4–5. Mr. Aguilar's abuse does not make this offense inevitable and does not excuse it. Nor does the defense contend that survivors of abuse generally commit sexual offenses. Its relevance is individual: Mr. Aguilar reports relying on pornography and increasingly disturbing online material as maladaptive coping. PSR ¶ 20. Because he never reported what happened to him as a child, he never sought out nor received treatment for everything he was carrying. His disclosure and subsequent treatment, which commenced during his pretrial supervision, now permit a response to needs that previously went unidentified. Probation itself identifies his undisclosed abuse and later treatment as grounds for considering a variance. PSR ¶ 88.

Mr. Aguilar began weekly individual therapy through Kaiser in October 2025 and HOPE sex-offense-specific treatment in February 2026. MR at 8. The PSR reports that he was discharged from PTSD treatment in May 2026 because of his progress, continued HOPE participation, and remained willing to receive additional care. PSR ¶ 55.

However, it is highly unlikely that he will receive any such treatment in the Bureau of Prisons. Although statistics regarding waitlists for BOP programming are not routinely published, in 2019, the Bureau of Prisons disclosed that: "Since the implementation of the current program model in 2005, 1,490 inmates have completed a Sex Offender Treatment Program. Currently, there are 270 inmates

participating in treatment, and 3,007 are awaiting placement in treatment." [7] To put those numbers into perspective, in 2019 there were 15,561 inmates incarcerated for sex offenses, so less than 2% were enrolled in sex offender treatment.[8] [9] Moreover, while sex offender treatment is voluntary in the BOP, only a small fraction of inmates actively seeking sex offender treatment in custody were receiving it. Seemingly acknowledging this gap in services, the BOP explained that "[t]o maximize public safety and taxpayer value, the Bureau ensures that programming slots are available for sexual offenders with a moderate-to-high risk of re-offending."[10]

Accordingly, Mr. Aguilar, a first-time offender convicted of an internet-only sex offense, is unlikely to be among small percentage of BOP inmates convicted of a sex offense able to enroll in treatment. A reduced custodial sentence will therefore best provide him with needed "educational or vocational training, medical care, or other correctional treatment in the most effective manner." *See* 18 U.S.C. § 3553(a)(2). A prompt return to his community and support, after incarceration, will best allow him to obtain treatment will also more effectively deter Mr. Aguilar from crime and protect the public. Because treatment, as an alternative to prison, is likely to deter Mr. Aguilar from any similar crimes, this Court should downward vary.

**CONCLUSION**

The instant offense warrants meaningful punishment, and the victims' continuing harm must not be minimized. But Mr. Aguilar's childhood abuse, longstanding limitations, lack of prior criminal history, treatment progress, and concrete family support distinguish him from an abstract guideline

---

[7] *United States Department of Justice*, Federal Prison System, FY 2020 PERFORMANCE BUDGET Congressional Submission, available at: https://www.justice.gov/d9/pages/attachments/2019/05/07/bop_sne_fy_2020_congressional_justification.pdf (p. 37).

[8] *See* Bureau of Prisons, Quick Facts, Federal Offenders in Prison (May 2019) available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/BOP_May2019.pdf

[9] As of May 2, 2026, there were 20,332 inmates (14.2% of the BOP population) imprisoned for sex offenses. *See* https://www.bop.gov/about/statistics/statistics_inmate_offenses.jsp (last accessed on May 11, 2026).

[10] *See* n.11, *supra*, Federal Prison System, FY 2020 PERFORMANCE BUDGET Congressional Submission at p. 37.

calculation. Considering these circumstances together, he respectfully requests no more than 36 months of imprisonment followed by five years of supervised release, with appropriate treatment and monitoring conditions and restitution as determined by the Court.

Dated: October 28, 2026

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

/S

ANA BOTELLO
Assistant Federal Public Defender